**BALL, et al v. NICHOLS.**
No. 71-7001.

Circuit Court, Duval County.

December 31, 1971.

Charles T. Akre, Washington, D.C., and Frederick H. Kent and William L. Durden of Kent, Durden & Kent, Jacksonville, for the petitioners.

Donald G. Nichols, State Attorney, and Susan Harrell Black, Assistant State Attorney, for the defendant.

MARION W. GOODING, Circuit Judge.

*Final judgment:* This case is before the court upon application of the parties for the entry of a final decree. The court has considered the factual and legal issues raised by the pleadings, the oral testimony, the documentary evidence, memorandum briefs and arguments submitted by counsel. From such consideration, the court has concluded that the equities of the case are with the

petitioners and that they are entitled to the relief prayed for in their petition.

## I. INTRODUCTION

The action is brought under the provisions of the common law and further under the provisions of the Trust Accounting Law (chapter 737, Florida Statutes) and the Declaratory Judgments Act (chapter 86, Florida Statutes) of the state of Florida, and the Florida Charitable Trust Act of 1971 (chapter 71-256, Laws of Florida).

## II. JURISDICTION AND VENUE

Jurisdiction of this court is established by the common law and confirmed by the statutory law of the state of Florida. In Florida, equity has inherent jurisdiction to carry into effect and supervise the charitable bequests and devises of a testator. The Statute of Charitable Uses defined the subjects of charity, but the jurisdiction of the English courts of chancery over charitable trusts did not arise by reason of this statute, as such jurisdiction had existed long prior thereto. Consequently, if it becomes necessary to construe the terms of a will which has created a charitable trust or to supervise the trust in any manner, application for such construction or supervision may be made to equity. The validity of a charitable bequest is determined according to the law of the state of the testator's domicile. I Redfearn, *Wills and Administration in Florida,* 396.

The Trust Accounting Law, chapter 737, Florida Statutes, provides that jurisdiction over testamentary trusts is vested in the circuit court in which the decedent was domiciled. The pleadings and evidence establish that Alfred I. duPont died on April 29, 1935, a resident and citizen of Duval County, Florida.

The Declaratory Judgments Act, chapter 86, Florida Statutes, also grants exclusive jurisdiction to the circuit court.

The Florida Charitable Trust Act of 1971, chapter 71-256, Laws of Florida, also grants exclusive jurisdiction to the circuit courts and sets venue in the circuit court having original jurisdiction of a trust if a proceeding under the Florida Trust Accounting Law has been instituted with respect to such trust.

The trustees of Mr. duPont's estate have complied with the Trust Accounting Law by qualifying as trustees and filing reports with this circuit court.

Therefore, the court finds that it has jurisdiction over the subject matter of this suit and that venue is properly laid in Duval County, Florida.

## III. PARTIES

The petitioners are the present trustees under the trusts created by the last will and testament and codicils thereto of Alfred I. duPont, deceased, and the Nemours Foundation, which is a corporation not for profit and is the charitable organization which will receive the entire residual income from the trust created by Mr. duPont's will. They are the proper parties-plaintiff in this action.

The defendant is the state attorney in and for the fourth judicial circuit of the state of Florida which circuit includes Duval County. §737.251, Florida Statutes, which is a part of the Trust Accounting Law, provides that in all proceedings under that chapter involving charitable trusts with unknown or unascertainable beneficiaries, the state attorney for the judicial circuit having original jurisdiction of said trust shall be deemed to be the representative of such beneficiaries for all purposes of such chapter.

§2 of chapter 71-256, Laws of Florida, known as the Charitable Trust Act of 1971, provides that responsibility for protection of the public interest in such a case shall rest with the state attorney for the judicial circuit having original jurisdiction of the trust if a proceeding under the Florida Trust Accounting Law has been instituted with respect to such trust.

The state attorney has admitted that he is the proper party-defendant and the court so finds.

## IV. PROVISIONS OF THE WILL AND CODICILS OF ALFRED I. duPONT AND CREATION OF THE NEMOURS FOUNDATION

In determining the intention of the testator the governing language is that used in the will and codicils executed by the maker of such documents. The last will and codicils of Mr. duPont are composed of forty printed pages and are very explicit in their terms and meaning. The true intent of Mr. duPont is perhaps best expreseed in item 4 of his second codicil. It is there stated that —

My said Will . . . provides that "The Nemours Foundation", a corporation to be organized for charitable purposes is ultimately, through my Trustees, to become one of my substantial beneficiaries . . . Its ultimate interest in my estate largely motivates my continued diligent attention to my financial affairs . . . the creation of this "Foundation" has been and is entirely my own idea, formulated many years ago, for the reason that it has been my firm conviction throughout life that it is the duty of everyone in this world to do what is within his power to alleviate human suffering and I have sedulously striven to that end. It is, therefore, natural that I should desire, after having made proper

provision for the immediate members of my family and the others whom I have seen fit to remember, that the remaining portion of my estate should be utilized for charitable needs.

The entire residuary estate of Mr. duPont was placed in trust and Mrs. duPont was the sole life beneficiary of the income thereof. Upon his death, the trustees were instructed to —

> . . . cause to be incorporated a corporation for charitable purposes, to be designated and known as "The Nemours Foundation" . . . and my Trustees are hereby directed to pay over, at convenient intervals, to the said corporation, the net income of my said estate, subject to the annuities and legacies hereinabove mentioned for the purpose of maintaining the said Estate of "Nemours" as a charitable institution for the care and treatment of crippled children, but not of incurables, or the care of old men or old women, and particularly old couples, first consideration, in each instance, being given to beneficiaries who are residents of Delaware...

While neither the trustees nor Mrs. duPont were required to utilize the following authority prior to the death of Mrs. duPont, Mr. duPont's will further provided in item 9 that —

> (A)  In case after my death my said wife, Jessie Ball duPont, shall desire to create a charitable corporation or institution for the purposes and objects covered by the directions herein given for the creation of the said "The Nemours Foundation," then my said Trustees shall pay over to the said "The Nemours Foundation," out of the principal of my said estate, any sum or sums not exceeding One Million Dollars . . . which my said wife during her lifetime may direct, and transfer to said corporation said "Nemours" Estate or any portion thereof for the use of said corporation, if my said wife shall so direct . . .

Following the death of Mr. duPont in April of 1935, Mrs. duPont and the other trustees of his estate did cause the creation and granting of a charter to the Nemours Foundation. Such charter was issued and granted by the Honorable DeWitt T. Gray, Judge of the Circuit Court for Duval County, Florida on February 25, 1936 (plaintiff's evidentiary exhibit no. 2). Such charter provided that —

> The general nature of the object of the corporation shall be the maintenance and support of and the making of contributions to charitable institutions operated for the care and treatment of crippled children, but not of incurables, or the care of old men or of old women, and particularly old couples, and for the construction and maintenance of the charitable institution authorized and directed by Alfred I. duPont, late of Duval County, Florida, now deceased, in and by his last Will and Testament and Codicils, now of probate and record in Duval County, Florida, to be established and maintained upon part or all of the property situate in Brandywine Hundred, New Castle County, Delaware, known as "Nemours", and for the purpose and object of carrying out both during the lifetime of Jessie Ball duPont, the widow of said Alfred

I. duPont and after her death, the terms and provisions of the said last Will and Testament and Codicils relating to such charitable institution...

Mrs. duPont and the other trustees caused to be constructed, maintained and operated by the Nemours Foundation on the Estate of Nemours, the Alfred I. duPont Institute for the purpose of providing care and treatment of crippled children.

Subsequent to the organization of the Nemours Foundation and more than twenty years ago, Jessie Ball duPont, individually and irrevocably assigned to the Nemours Foundation an undivided twelve percent of the residuary income of the trust estate created by Mr. duPont's will. Now that Mrs. duPont has died the entire income from the estate of Mr. duPont is payable to the Nemours Foundation. It is because of the large additional sums that have become available to the foundation that the trustees have filed this action to obtain constructions of the will of Mr. duPont and to receive instructions of the court as to the authorized use and implementation of such additional funds.

From the admissions in the pleadings and from the evidence submitted, the court finds that the will of Mr. duPont and other conveyances established title to all of the real property contained within the Estate of Nemours in the Nemours Foundation subject to a reserved life estate in the Mansion property to Mrs. duPont. Mrs. duPont's death, on September 26, 1970, has terminated the life estate so that now title in its entirety is vested in the Nemours Foundation.

### V. PROVISIONS OF THE WILL OF JESSIE BALL duPONT

Under the provisions of the will of Mr. duPont and by prior conveyances, the contents, furniture and fixtures of the Mansion House and in all related buildings and structures on the Estate of Nemours belonged to Mrs. duPont. In item 3 of her will, she made the following provision with regard to such personal property located at Nemours —

> I hereby give and bequeath to THE NEMOURS FOUNDATION, . . . in charge of the estate called Nemours . . . the former home of my late husband, Alfred I. duPont, and myself, all of my tangible personal property which at the time of my death is located in or about the part of Nemours generally called the Mansion House; . . . I direct that this bequest of tangible personalty to THE NEMOURS FOUNDATION shall be upon the conditions that such property shall remain at the Mansion House and shall continue to be used as it was at the time of my husband's death, to remain so for the educational benefit of the public, *and that the property be subject to all of the instructions set forth in Item 9 of the Last Will and Testament of my husband . . .*

Therefore, all of the property, real, personal and mixed of the Estate of Nemours is now available for use and utilization to fulfill the purposes and intent of Mr. duPont as supplemented by the provisions of the will of Mrs. duPont.

## VI. EVIDENCE

The parties, through their counsel, stipulated to most of the facts which are set forth in the complaint and the petitioners offered oral testimony and documentary evidence to support those allegations to which the defendant stated that he was without knowledge or which he denied.

The first witness to testify was William B. Mills. Mr. Mills is one of the present trustees of the trust created by the last will and testament and codicils of Alfred I. duPont, deceased. He is also one of the executors of the estate of Jessie Ball duPont, deceased. He is president of the Florida National Bank of Jacksonville, which is the corporate trustee of the trust created by Alfred I. duPont and which is also the corporate executor of the estate of Jessie Ball duPont, deceased. He is also a member of the Nemours Foundation.

Mr. Mills testified as to the creation of the Nemours Foundation by Mrs. duPont and the other trustees of the estate of Alfred I. duPont, and the construction, operation and maintenance of the Alfred I. duPont Institute, which is located on the Estate of Nemours and which provides hospital care and treatment for crippled children.

Mr. Mills also testified as to the physical arrangement of the rooms on the various floors of the Mansion House and set forth in general terms the various plans that have been discussed by the trustees as to the use and utilization of the Estate of Nemours and the Mansion House in accordance with the will and directions of Mr. duPont. Mr. Mills also testified to the receipt and consideration by the trustees of the additional medical care and treatment programs recommended by the staff of the Alfred I. duPont Institute and further testified to the employment of the architectural firm of Saxelbye, Powell & Roberts to prepare proposed plans for the utilization of the Estate of Nemours, including the Mansion House, and for the construction of additional facilities for the consideration of the trustees in the event the court construes the will of Mr. duPont to permit utilization of the Mansion House for hospital purposes and further construes the will to provide for the utilization of the entire Estate of Nemours for hospital purposes provided the grounds and certain portions of the Mansion House will be open for visitation by the public and provided further the court gives a liberal and broadened construction to the phrase

"crippled children" so as to permit utilization of the entire Estate of Nemours and the additional income from the estate of Mr. duPont for such purposes.

The second witness to testify was G. Dean MacEwan, M.D. Dr. MacEwan is the medical director and surgeon-in-chief of the Alfred I. duPont Institute of the Nemours Foundation. Dr. MacEwan testified to projects proposed to carry out the intentions of Mr. duPont, provided the court grants the construction of the will prayed for and instructs the trustees as to the entire Estate of Nemours as a hospital and provided also the court directs the use of the additional funds from the estate of Mr. duPont for the care and treatment of crippled children in a broadened sense of the phrase.

Dr. MacEwan further testified to the presentation of proposals to the trustees for their consideration and of his work with the architects in the preparation of alternative conceptual plans for the utilization of the estate and for the construction of additional facilities thereon.

The next witness to testify was Dr. Herman Rosenblum of Wilmington, Delaware. Dr. Rosenblum is a practicing pediatrician and is associated on the staff of the Alfred I. duPont Institute on a limited basis. Dr. Rosenblum testified to the need for the enlargement of services and facilities in accordance with the various plans proposed to the trustees and under consideration by them subject to the terms and provisions of the final judgment of this court. The next witnesses to testify were Harry C. Powell and Larry N. Ponder of the Saxelbye, Powell & Roberts architectural firm. Messrs. Powell and Ponder introduced into evidence aerial photographs of the Estate of Nemours, photographs of the present Alfred I. duPont Institute, photographs of the Mansion House and schematic architectural plans setting forth in three different concepts how and in what manner the Estate can be utilized for total hospital purposes and included within that testimony various alternative facilities for consideration of the court and the trustees.

The last witness to testify was George A. Mathews, administrator of the Baptist Memorial Hospital of Jacksonville and who was qualified as an expert in the field of hospital administration. His education, experience, prior involvement in similar projects and his present capacity does qualify him as such an expert and the court does find him to be one. The various architectural proposals and medical projects were reviewed with Mr. Mathews and he gave testimony that in his professional opinion the various alternatives proposed by the architectural and medical staff would constitute the entire Estate of Nemours including the Mansion House as a hospital and that the functions and programs recom-

mended would constitute medical care and treatment ordinarily provided by a modern crippled children's hospital.

## VII. CHARITABLE INSTITUTIONS

The provisions of Mr. duPont's will which require the creation, establishment and operation of the Nemours Foundation as a charitable institution have heretofore been set out in this judgment. It now becomes incumbent upon the court to set forth the rules of law governing its interpretation and construction of the will and the intent of Mr. duPont with regard to that institution. There are various definitions and rules of construction which control and guide this court in that determination.

> A charitable trust is to be interpreted and administered so as to accomplish the intent of the creator thereof . . . the trust will be allowed to operate under the control of equity. It is the policy of the courts to make every intendment in favor of charitable trusts. 5 Fla. Jur., *Charities*, §§4-11, 565.

> In legal parlance the word "charity" has a much more extended significance than in common speech. While a precise and complete definition is difficult to frame, the most comprehensive and carefully drawn definition is that it is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life . . . 15 Am. Jr. 2d, *Charities*, 8-9.

> Gifts or trusts for charitable purposes are favorites of the law and the courts. 15 Am. Jur. 2d, *Charities*, 110-112.

> The law treats the charitable trust with very considerable favor. Bogert, *Trusts and Trustees*, §§361 and 374.

> The courts should be left free to apply the standards of the time — on the theory that what may be charitable in one generation may be non-charitable in a later age, and vice versa. Ideas regarding social benefits and public good change from century to century and vary in different communities. *It must expand with the advancement of civilization and the daily increased needs of man.* Porter v. Baynard, Supreme Court of Florida, 28 So.2d 890.

Based upon the evidence and the law applicable thereto, the court finds that the last will and testament and codicils thereto of Alfred I. duPont require the trustees to establish, maintain and operate a charitable institution. The charitable institution which Mr. duPont's trustees are required to establish does, in fact, require the construction, maintenance and operation of a hospital as the primary and dominant purpose of that institution. It is clear that it was the will and intent of Mr. duPont that the entire "Estate of Nemours" be utilized predominantly and primarily for the purpose of constructing thereon a hospital for the care and treatment of

crippled children and old folks. There was testimony submitted to the court by the trustees, by the director of the hospital, by the architects and by other expert witnesses as to alternative concepts that may be employed which would require and justify the use of the Estate for those purposes. From such testimony, it is the conclusion of the court and the court finds that the adoption and implementation of any one of such plans or reasonable modifications thereof would result in the construction and operation of a hospital clearly within the will and intent of Mr. duPont.

## VIII. HOSPITAL

There were various definitions given to the court by the expert witnesses and by law as to the meaning of the word "hospital." Mr. Mathews testified that the alternative plans as prepared by the architects would constitute a hospital within the generic and current meaning of that word. The court was provided by brief with various Florida statutory provisions and definitions as well as quotations from dictionaries, legal authorities, and case law defining the meaning of the word hospital and from which the court concludes that any and all facilities that are used predominantly and primarily for the fulfillment of a function which is a part of a completely modern hospital may be included within that definition.

A hospital is primarily a service organization. It serves three groups — the patients, their doctors and the public. A hospital furnishes a place where the patient, whether rich or poor, can be treated under near to ideal conditions. Such an institution makes available room accommodations, special diet, x-ray facilities, clinical laboratory facilities, surgery, nursing care, clinical and medical research, education of doctors and para-medical assistants, including nurses, a multitude of other medical services and equipment both for in-patient and out-patient care and treatment.

In determining the extent to which a hospital may devote its funds and services, its managing board is given primary responsibility for the first decision as to what is reasonably necessary for the fulfillment of all generally recognized functions of a complete, modern hospital and their determinations are to be given great weight in deciding what is a predominant and primary hospital purpose, even though there may be some incidental limitations, such as the availability for visitation purposes of part of the Mansion House and grounds as required by the will of Mr. duPont.

Such use must, of course, have a primary or predominant use as a hospital as distinguished from a mere secondary or incidental use, but it is clear that when the availability of a part of the Mansion House and grounds for public viewing is weighed against the entire

intention of Mr. duPont as carried out with the substantial funds he made available for that purpose that such public purposes other than hospital will be at most incidental and would not in any manner whatsoever, interfere with the predominant use of the entire property including the Mansion House and grounds for hospital purposes.

Mr. duPont's Will does provide that —

> "The Nemours Foundation" shall be created and maintained as a memorial to my great, great grandfather, Pierre Samuel duPont de Nemours, and to my father, Eleuthere Irenee duPont de Nemours, and a proper tablet shall be erected in the present mansion to so indicate.

and

> My Trustees shall arrange for the admission of the public to the Mansion and other buildings and the grounds at such times and under such rules and regulations as they may provide.

It should be noted that it is "The Nemours Foundation" and not just the Mansion House or the Estate that is to be the memorial. Furthermore, the trustees may adopt rules and regulations controlling public visitation.

The court finds no conflict between requiring parts of the Mansion House and the grounds to be available for public viewing and the operation of the foundation and the entire Estate as a hospital. It would appear from the size of the funds that will become available that "Nemours" will not only continue to be a hospital, but will be a showplace of such institutions and certainly should be available for public visitation.

## IX. CRIPPLED CHILDREN

Dr.MacEwen testified that the activities of the expanded hospital facilities could be utilized in three basic functions — (1) Hospital and medical care for crippled children, (2) Research related to cause and treatment of crippling deformities in children, and (3) Education program for the treatment of crippled children to educate personnel involved in the ongoing programs of the hospital as well as education of those in other areas of the country and world. The first function would be the principal function of the expanded hospital facility with the latter two functions occupying a secondary and incidental roll.

The court was provided with many authorities defining the phrase "crippled children" and it appears that in its original context, the word "cripple" applied only to those who were orthopedically damaged in one of their limbs. Through the development of the law, it appears that the word "cripple" has now been expanded to include the blind, the mentally incapacitated, and anyone whose physical functions are impaired, including loss of

hearing, deafness, cystic fibrosis, harelip, cleft palate, congenital cataract, cerebral palsy, cardiac conditions and silicosis, or any other deformity regardless of whether or not such impaired physical functions or movements are due to an orthopedic condition. It would appear that there is not now any limitation to such definition provided of course, there is compliance with the requirement of Mr. duPont that such conditions be not incurable. The best definition of the phrase "crippled children" is contained in the case of In re Lane's Will, 119 N.Y.S.2d 17, where the court stated —

> As a result I elect to adopt the same and to define and to determine for the purposes of this proceeding *that a crippled child means a person under twenty-one years of age who, by reason of a physical defect or infirmity, whether congenital or acquired by accident, injury or disease, has been deprived of strength, activity, or capability for service or use, in any part of the human body.* (Italics added.)

> This definition is very broad and may not be acceptable in all places. Still it springs from extensive research with the benefit of information from many sources, including the usage, speech, acts and mind of the average run of people . . . That such definition covers the intention of the testator and was the meaning he had in mind when using the words "crippled children" in his last will and testament finds support in the circumstances surrounding him at the time of and immediately previous to the execution of the instrument.

In view of the language in the second codicil to Mr. duPont's will that it had been his "firm conviction throughout life that it is the duty of everyone in this world to do what is within his power to alleviate human suffering..." the court would be doing an injustice to construe the phrase "crippled children" with any limitation whatever other than the one prescribed by Mr. duPont himself — that such condition not be incurable.

### X. CARE OF OLD MEN OR OLD WOMEN AND PARTICULARLY OLD COUPLES

It is not the intention of the trustees to implement that part of Mr. duPont's will providing for the care of old men or old women and particularly old couples at this time, since their present intention is to devote their first attention to crippled children. Nevertheless, the court has been provided with definitions of the phrase and it is the court's conclusion that the phrase was intended to apply to those persons over sixty-five years of age who are in need of medical or paramedical care, however slight or great it may be and would not include those who need only food, clothing and shelter. The court can do no better than to repeat again the language of Mr. duPont that his motivation and intent, or his duty, as he saw it, was to "alleviate human suffering."

## XI. OTHER CHARITABLE INSTITUTIONS

While it is clear that Mr. duPont desired that first consideration be given to residents of Delaware, the trustees were authorized to consider other worthy charitable institutions. Item 10 of the will provides —

> I further direct that, after the death of my beloved wife, Jessie Ball duPont, if the net income of my estate should in any year or years exceed the sum or sums sufficient to properly provide for the conduct and operation of said "The Nemours Foundation," . . . such surplus income may from time to time be used . . . in contributions to other worthy charitable institutions designated by said Board and approved by my Trustees as may be conducted for the care of, or the care and treatment of, or the care and education of crippled children, or the care of old men, or of old women, or of old couples, or any one of such purposes. It is my wish that the people of Delaware needing the care of such institutions shall be properly provided for before contributions are made to institutions of any other state or states, but said Board, my Trustees concurring, is hereby given full power to determine what constitutes the necessary reserves for "The Nemours Foundation" and what constitutes proper provision for the Delaware institutions . . .

Therefore, it is apparent that excess funds may become available for similar charitable institutions outside the state of Delaware whenever there are sufficient funds on hand for such purpose, provided such funds are used in accordance with the provisions and limitations of the will.

## XII. TAX CONSIDERATION AND CONSEQUENCES

In addition to the relief requested regarding the use of the "Estate of Nemours", including the Mansion House, for hospital purposes, the petitioners requested the following relief —

> To preserve the Foundation's federal tax exempt status and the deductibility of contributions and gifts to it in the event it becomes a private foundation under federal law, the Petitioners request that the governing instrument of the Foundation be amended to provide that for any taxable year in which it is a private foundation: (1) Its income for each taxable year be distributed at such time and in such manner as not to subject the Foundation to tax under §4942 of the Internal Revenue Code of 1954, (2) The Foundation be prohibited from engaging in any act of self-dealing so as to be subject to tax under §4941 of such Code, (3) The Foundation be prohibited from retaining any excess business holdings so as to be subject to tax under §4943 of such Code, (4) The Foundation be prohibited from making any investments in such manner as to be subject to tax under §4944 of such Code, and (5) The Foundation be prohibited from making any expenditures so as to be subject to tax under §4945 of such Code.

At the final hearing, the court announced the ruling, confirmed in this judgment, that based on the testimony, documentary

evidence and law applicable to such facts, the entire Estate of Nemours, including the Mansion House, is and would continue to be a hospital. As a result of such ruling the requested amendment of the governing instrument became moot and unnecessary. As a hospital, the Nemours Foundation is not a private foundation under §509(a)(1) of the Internal Revenue Code of 1954 and its governing instrument is not required to be amended.

Having considered the law and the evidence as discussed in the foregoing opinion, it is ordered, adjudged and decreed that —

1. This court has jurisdiction over the parties and the subject matter of this action.

2. It was the intention of the testator, Alfred I. duPont, to provide for and to require the establishment of a "charitable institution" and that charitable institution was to be primarily and predominantly a hospital.

3. It was the intention of the testator, Alfred I. duPont, that the entire "Estate of Nemours" be used for hospital purposes.

4. The predominant and primary purpose of the "Estate of Nemours" shall be for use as a hospital. The secondary and incidental use shall be to allow visitation by the public as specified herein.

5. It was the intention of the testator, Alfred I. duPont, that all of the "Estate of Nemours," including the Mansion House, be made a part of, and be integrated and used for hospital purposes, and specifically, that the Mansion House be used for hospital administrative functions, clinical conferences, lectures, hospital meetings, maintenance of a medical library, storage and exhibition of relevant medical films, entertainment of distinguished members of the medical and hospital professions, meetings of state, national and international medical associations, especially those concerned with the care of children and the aged, and for any other related hospital purposes, except the actual housing of patients and providing of patient care therein.

6. Appropriate rooms of the Mansion House shall, in accordance with provisions of the will, be used for the purpose of providing a library and exhibiting to the public interesting and valuable literature, works of art and any articles of historic and artistic interest for the advancement of education, and maintained as far as possible, in their present condition.

7. The trustees are further required to arrange for the admission of the public to the Mansion and other buildings and the grounds at such times and under such rules and regulations as they may provide.

8. The use of property as a "hospital" or for "hospital purposes" includes any property or facility which is used predominantly or primarily for a purpose which is incidental to and reasonably necessary for the accomplishment of hospital purposes or which is reasonably necessary for the fulfillment of a generally recognized function of a complete, modern hospital.

9. As proposed by the trustees, the medical and administrative staffs and by the architects the various concepts if carried out as proposed or as reasonably modified would in their entirety, constitute a hospital.

10. The phrase "crippled children" as used in Mr. duPont's will is defined to mean persons under twenty-one years of age, who by reason of a physical defect or infirmity, whether congenital or acquired by accident, injury or disease, has been deprived of strength, activity or capability for service or use, in any part of the human body.

11. The phrase "care of old men or old women, and particularly old couples" is meant to include those over sixty-five years of age who are in need of supportive or alleviating medical or para-medical care beyond mere food, clothing and shelter.

12. Since the court has determined that the entire "Estate of Nemours", including the Mansion House, may be integrated and used for hospital purposes as described above, this court finds that the relief requested by the petitioners in paragraph (c) of the petition relating to the amendment of the governing instrument of the foundation, is moot and unnecessary and therefore does not grant such relief.

13. The petitioners may make application for further definition or instructions to implement the construction and instructions contained herein.